# EXHIBIT 18

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CASE NO. 5:23-CV-00155-MJF

JONATHAN MARSHALL,

        Plaintiff,

v.

CARLOS DEL TORO, in his
official capacity of
Secretary of the U.S.
Department of the Navy,

        Defendant.
_____/

**FINAL DRAFT**

**CONFIDENTIAL SWORN STATEMENT**

| | |
|---|---|
| SWORN STATEMENT OF: | RENNELL PITTS |
| DATE: | SUNDAY, MAY 26, 2024 |
| TIME: | COMMENCING AT: 12:30 p.m.<br>CONCLUDING AT: 1:22 p.m. |
| LOCATION: | VIA VIDEOCONFERENCE<br>(ZOOM) |
| REPORTED BY:<br>TRANSCRIBED BY: | ADIEREN M. NARRO, CER<br>YVONNE LaFLAMME, RPR, FPR<br>COURT REPORTER |

**APEX REPORTING, INC.**
**P.O. BOX 5785**
**TALLAHASSEE, FLORIDA  32314**
**(850) 597-5185**
**apexreportingservices@gmail.com**
**tallycourtreporting.com**

2

1    APPEARANCES:

2                        For the Plaintiff:

3                             MARIE A. MATTOX, ESQ.
                              Marie Mattox, P.A.
4                             203 N. Gadsden Street
                              Tallahassee, FL 32301
5                             marie@mattoxlaw.com

6

7                        *      *      *      *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                     I N D E X   P A G E

2

3      DESCRIPTION                        PAGE NO.

4    RENNELL PITTS

5         Examination by Ms. Mattox            4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                      P R O C E E D I N G S

2              THE COURT REPORTER:  All right.  Mr. Pitts, if

3        you can state your full name onto the record for

4        me, please.

5              MR. PITTS:  My name is Rennell Timothy Pitts.

6              THE COURT REPORTER:  And that is R-a-n-e-l-l?

7              MR. PITTS:  R-e-n-n-e-l-l.

8              THE COURT REPORTER:  Thank you.  And if you

9        can raise your right hand for me.  Do you solemnly

10       swear or affirm that the testimony you give here

11       today is a truth, the whole truth, and nothing but?

12             MR. PITTS:  I do.

13             THE COURT REPORTER:  Thank you.

14 Whereupon,

15                      RENNELL PITTS

16 after being first duly sworn, testified as follows:

17                      EXAMINATION

18 BY MS. MATTOX:

19       Q.   And, Mr. Pitts, if you can just identify

20 yourself for the record.

21       A.   I'm Rennell Pitts.  I'm a former firefighter

22 at NSA Panama City.

23       Q.   Okay.  And what I'm going to do is -- what is

24 your year of birth?  And not date of birth, but just

25 year of birth.

1    A.    1991.

2    Q.    Okay.  And this is a sworn statement.  It's

3    voluntary.  You can leave at any time.  And at the

4    conclusion, I'm going to give you the opportunity to

5    read this sworn statement and make any corrections or

6    changes that you want to make. Okay?

7    A.    Yes, ma'am.

8    Q.    Okay.  And, Mr. Pitts, how long did you work

9    at NSA Panama City?

10    A.    Four years total.

11    Q.    Okay.  And what years were those?

12    A.    2016 -- or it was 2017 to 2021.

13    Q.    Okay.  And were you there at the time that --

14    were you still working for NSA Panama City at the time

15    that Jonathan Marshall had been injured and needed an

16    accommodation?

17    A.    Yes, ma'am.  I was.

18    Q.    Okay.  All right.  I'm going to talk about

19    that in just a second because that's what this case is

20    all about, okay, about what Mr. Marshall needed.  And I

21    understand that you were also part of the union; is that

22    right?

23    A.    Yes, ma'am.

24    Q.    Okay.  And what position did you hold with the

25    union, at least part of the time that you were employed?

6

1     A.   I was a union steward.

2     Q.   Okay.  And that would have been from about

3   when until when?

4     A.   Um, probably 2020 to 2021 or.  Yeah.

5     Q.   Okay.  All right.  And why did you stop being

6   a union steward?

7     A.   I left.  I left altogether.

8     Q.   All right.  When you left is when you stopped

9   being the union steward?

10    A.   Yes, ma'am.

11    Q.   Okay.  All right.  And this, this is the issue

12  in this case, okay?  We have Jonathan Marshall who had

13  been injured in a car accident.  He was out on FMLA

14  because of the baby, because his wife was having a baby,

15  and he had the FMLA.  And then at the end of that time

16  period, he had requested an ADA accommodation of

17  clerical work or administrative work and fire prevention

18  inspections.  And they denied that.  Mapledoram denied

19  that, okay?

20         So tell me what you know about that and other

21  people who may have been accommodated.  Because one of

22  the issues that they're saying in this case is that,

23  "Well, he can't compare himself against Emily Gray

24  because Gray had an on-the-job injury versus an

25  off-the-job injury."

1        So I've packed a lot into that, but tell me
2   what you know about all of this.
3        A.    In the beginning, when Emily Gray got injured,
4   it was off of work.  It was said to be off of work.  She
5   ended up having two injuries.  One of them were off and
6   one of them were on, while she was at work.
7        Q.    Okay.  And so the first injury, okay.  That
8   she had, was that on or off?
9        A.    That was off.
10       Q.    Okay.  And was she then -- do you know what
11  her restrictions were, her medical restrictions?
12       A.    That's when she had the back brace.  So she
13  wasn't working at all.  But then they started -- she was
14  the first one that got the light duty.  So she was able
15  to come in and work on the computer.
16       Q.    And that was for the off-the-job injury; is
17  that right?
18       A.    Yes, ma'am.
19       Q.    So they accommodated her for an off-the-job
20  injury by allowing her to come in and to do basically
21  clerical work?
22       A.    Yes, ma'am.
23       Q.    And how do you know that, Mr. Pitts?
24       A.    I just was there in the time frame.  And then
25  as far as seeing her working, she was able to -- she was

1  doing like all the administrative paperwork.  So instead
2  of us putting it in the computer, we would give it to
3  her.  And then I guess the doctor approved that she can
4  work a little bit, and that's when she probably did
5  about two months of light duty.
6       Q.    Okay.  And so how did you know that she
7  sustained an off-the-job injury?  How did you find out
8  about that?
9       A.    She said it herself that it was off the job.
10      Q.    And did she tell you how she had been injured
11 off the job?
12      A.    She did at the time, but I don't remember
13 exactly what she said.
14      Q.    Okay.  All right.  And then, so she was out
15 for a while completely.  And then when the doctor had
16 given her the okay to come back to work, that's when
17 they had given her the light duty?
18      A.    Yeah.  Yes, ma'am.
19      Q.    And how did you know that her doctor had
20 released her to return to work and that she was given
21 the light duty?  How did you know that?  That the doctor
22 had released her?
23      A.    I didn't know that the doctor did release her,
24 but that's what she stated.  That's how she was able to
25 get light duty.

9

1      Q.   That's my question:  Did Emily Gray tell you
2  that?
3      A.   She did.
4      Q.   Okay.  All right.  And so then she worked two
5  months in that -- around two months in the light duty
6  position doing clerical work; is that right?
7      A.   Yes, ma'am.
8      Q.   Then after that, did she sustain an on-the-job
9  injury?
10     A.   She did.  They were at a house fire, and she
11  re-injured her back.  And it was something else.  I
12  forgot exactly what it was.  She did have an on-the-job
13  injury.
14     Q.   And then do you remember what year it was that
15  Emily had the first accommodation for the off-the-job
16  injury?
17     A.   I think it was -- it may have been -- I may
18  have got my dates wrong.  It may have been '22.  I
19  started at vending at '23.  So, yeah, it may have been
20  2022 that year.
21     Q.   All right.  So you were still there at that
22  time?
23     A.   I was.  I was there up until January of '23,
24  last year.
25     Q.   Got it.  January of '23?  Okay.  So for that

1  time period where she was being accommodated and doing

2  the clerical duties for the off-the-job injury, you were

3  there, you talked to her, and you knew that she had said

4  to you, based upon information she provided to you, that

5  her doctor had released her to light duty and that she

6  was given the light duty based upon your observations?

7          A.   Yes, ma'am.

8          Q.   Okay.  All right, then.  Do you know how many

9  months later after she had returned -- and I'm

10 presuming, by the way, that at the time of her second

11 injury, she was off the light duty assignment; is that

12 right?

13         A.   Yes, she was.  She was back on full duty.

14         Q.   Okay.  Do you know how much time period --

15 time expired between the date that she went back to full

16 duty and the time that she was injured?

17         A.   I don't, not specifically.

18         Q.   All right.  Rennell, let me ask this.  Why in

19 the world, if Jonathan had asked for clerical work or

20 administrative work at the end of his PPL, why would

21 they not have allowed him to do that but they allowed

22 Emily Gray to do that?

23         A.   Yeah.  That was my question to management

24 about all the personnel that put in reasonable

25 accommodation, because no one was offered light duty.

1   And, Ms. Gray, she got light duty.

2        Q.    Under exactly the same situations, an

3   off-the-job injury?

4        A.    Yes, ma'am.

5        Q.    And what did management say about that?

6        A.    They said that they just approved it because

7   too many people were out.  So that was to help out

8   demand.

9        Q.    All right.  Well, did you say, "Well, you've

10  got Jonathan Marshall over here, and you've got other

11  people that needed light duty also.  Why did you give it

12  to Emily Gray?"

13       A.    Yes, ma'am.  And the response was that it just

14  was approved; that there was no light duty during their

15  time frame that they asked.

16       Q.    But was Emily Gray doing the light duty during

17  that same exact time period?  Or had they finished her

18  light duty?

19       A.    She was -- at that time, she was finished with

20  it, but a lot -- some people were further along in the

21  RA process than Ms. Gray.  So Derek Meyer, and, like,

22  Harmon, they had put in the RA request, probably, I'd

23  say, a year before Ms. Emily Gray worked it.  And I'm

24  not sure exactly where they were in the process, but

25  they were supposedly finding them jobs.

12

1      Q.   Okay.  And that's Derek Meyer?

2      A.   Meyer.  And George Foreman.

3      Q.   Okay.  And did both of them, did they still

4  continue to be employed by NSA, Panama City, or did

5  they -- were forced to leave?

6      A.   They were on the books, but ultimately, they

7  both were forced to leave because --

8      Q.   They were not given the accommodations?

9      A.   Yes, ma'am.

10      Q.   So they had both filed their request for

11  accommodations, the RA forms, before Emily had?

12      A.   Yes, ma'am.

13      Q.   And so theirs were pending at the time that

14  Emily was actually given the accommodation for an

15  off-the-job injury?

16      A.   Yes, ma'am.

17      Q.   Did you ask, "Why in the world are they being

18  treated more favorably?"

19      A.   I did.

20      Q.   I'm sorry.  That Emily was being treated more

21  favorably.

22      A.   Not necessarily Emily.  But I was trying to

23  figure out why she was granted the light duty and nobody

24  else was.

25      Q.   And even though their request for reasonable

1   accommodations were pending at the time that she

2   requested it?

3        A.   Yes, ma'am.

4        Q.   And hers was a newer request?

5        A.   Yes, ma'am.

6        Q.   And so their answer was what?

7        A.   That at the time that the other people asked,

8   there wasn't any light duty available for them.

9        Q.   But it was the same job, wasn't it; the same

10  thing Emily was doing, would have been available at the

11  time that they requested their accommodations, right?

12       A.   Yes, ma'am.

13       Q.   Okay.  So did they explain why all of a

14  sudden, these new -- this clerical administrative work

15  came open, but it had not been open at the time that

16  they had, that Derek and George had requested it?

17       A.   Outside of them stating to help out with

18  manning, that was all that I got.  That was the answer,

19  that it was approved now to help out the manning.

20       Q.   All right.  So then -- but their request were

21  still pending?

22       A.   Yes, ma'am.

23       Q.   Okay.  All right.  So she gets it, then she's

24  finished with it at the time that Jonathan Marshall

25  needed it, right?

14

1      A.    Yes, ma'am.  There was four people.  Derek

2   Meyer was first, George Foreman, and Michael Parkins,

3   and Cody Marshall.  They all were pending.

4      Q.    Okay.  All right.  And then they did not --

5   now, Michael got some accommodation, didn't he?

6      A.    To my knowledge, they -- workers comp.  That

7   was the accommodation.  Nothing as far as coming to

8   work.

9      Q.    Okay.  So his was an on-the-job injury?

10     A.    Yes, ma'am.

11     Q.    Okay.  But off the job -- so you've got

12  then -- was Derek -- were Derek and George's injuries

13  off the job?

14     A.    Derek was on the job, but George and Cody's

15  were off the job.  George Harmon, his was through the VA

16  medication.

17     Q.    You said Derek was on or off?

18     A.    Derek was on the job.

19     Q.    On the job.  And then George was off the job?

20     A.    Yes, ma'am.

21     Q.    Okay.  Parkins was on the job.  And Gray,

22  Emily Gray, was off the job?

23     A.    Yes, ma'am.  But she did have one on the job.

24     Q.    But that was later?

25     A.    Yes, ma'am.

1      Q.    Okay.  After she had already been given the

2  accommodations of clerical work, administrative work?

3      A.    Yes, ma'am.

4      Q.    Okay.  And then you got Marshall, who is off

5  the job?

6            Okay.  Then, by the time that Marshall needed

7  the accommodation for his off-the-job injury, was Emily

8  finished?  Had she already been released to then go back

9  into the field and go into full duty?

10     A.    Yes.

11     Q.    So then was anybody, during the time period

12 that Emily had request or that Emily left the light duty

13 job, that clerical --

14           (Internet instable.)

15     Q.    -- at that point in time, union steward at

16 that time?

17     A.    Yes, ma'am, I was.

18     Q.    And did you work with him to try to get the

19 accommodation?

20     A.    Yes, ma'am.  I had told him just to email the

21 chiefs to see if he could -- to ask again about light

22 duty, because obviously it was being worked.  So there

23 is a light duty now.  But I did let him know to reach

24 out to the chiefs to see if he could get light duty.

25     Q.    And when you say "the chiefs," are you talking

1  about Barber and Mapledoram?

2       A.    And Skaggs.  Because I wasn't sure who his

3  supervisor was, so I told him to just email all three.

4       Q.    All right.  So then you get -- he does that.

5  And then what involvement then did you have?  He was

6  then told no, that there is no light duty.  Is that what

7  your understanding was?

8       A.    Yes, ma'am.

9       Q.    Then what -- what happened next?  After?

10       A.    I just offered him some solutions that we --

11  routes we could -- if he wanted to go the union route or

12  if he wanted to go like the EEO route.  Just offer him

13  which ways that he wanted to take it.

14       Q.    Is that the point at which you went and talked

15  to the chiefs, either Barber or Mapledoram, about not

16  giving -- or did you go and talk to them at that point

17  about not giving him light duty?

18       A.    Yes, ma'am.  I did.  But Cody -- they said

19  Cody's situation was different because he was incapable

20  of doing light duty, like, at all.

21       Q.    Well, his doctor said that he could do light

22  duty.  Did you see his doctor's note that say that he

23  could do light duty?

24       A.    I didn't see it, but he told me that he could.

25  His doctor did say he could do light duty.

1    Q.    And so other than saying that he could not do

2    even the light duty, was there anything else, any other

3    excuse that they offered for not giving Cody the light

4    duty?

5    A.    No, ma'am.  But with being there, you know,

6    you could see in this -- this my opinion -- that they

7    were trying to get bodies in.  So the people that were

8    before Emily, they kind of were trying to get their jobs

9    off the book so they can get personnel in.

10    Q.    They wanted to replace them?

11    A.    Yes, ma'am.  And that's what ended up

12    happening.  They replaced the people that were --

13    Q.    On light duty?

14    A.    Oh, yeah.  Yes, ma'am.  That was in the

15    reasonable accommodation process.

16    Q.    Oh, I got you.  That didn't get the light --

17    Derek Meyer, George and Marshall did not get the light

18    duty.  So they fired them because they couldn't come

19    back -- they refused to return them back to work?

20    A.    Yes, ma'am.

21    Q.    So if they had given them light duty and left

22    them in the positions for light duty, then they would

23    have to have -- when they got released -- put them back

24    into their normal positions?

25    A.    Yes, ma'am.

1    Q.   But by denying them the light duty and saying

2 that they couldn't do the jobs, that they had no light

3 duty, that justified them firing them?

4    A.   Yes, ma'am.

5    Q.   Wow.

6    A.   Yes ma'am.  And that's my opinion, because

7 that's what happened.  They got fired, and then job

8 announcements got posted, and we got personnel.

9    Q.   Unbelievable.  Okay.  So after Emily Gray

10 stops performing that light-duty position and she

11 returns back into the field and does full duty -- and I

12 asked you this a minute ago, and I'm not sure whether I

13 got an answer to it -- how long was it?  Do you remember

14 between the time that she got released until she got

15 injured and had an on-the-job injury?

16    A.   I'm not sure exactly.

17    Q.   All right.  And then she sustains this

18 on-the-job injury.  All right.  What happened then?

19    A.   At that point, after Mr. Parkins, I was

20 advising anybody that got hurt, to go to Gulf Coast

21 Hospital, because that's the only hospital that could do

22 worker's comp.  So she did go to Gold Coast Hospital.

23 And she wasn't out long on this one.  So I think she did

24 the initial 45 days and then she was back full duty.

25    Q.   So she didn't have to have light duty the

1    second time she came back?

2         A.    No, ma'am.

3         Q.    Okay.  All right.  So have you seen anybody

4    in -- other than Emily Gray, have you seen anyone

5    fulfill that light-duty position that she was in after

6    her off-the-job injury?  Have you seen anybody else

7    fulfill that light-duty job other than her?

8         A.    No, ma'am.  She was the only one.

9         Q.    All right.  Rennell, why did you leave?

10        A.    Just due to management picking on African

11   American individuals, I just felt like I would be next.

12   And then it just -- it was a hostile work environment.

13   I needed something different.

14        Q.    And where did you go after that?

15        A.    I went to Fort Benning, what is now Fort

16   Moore.

17        Q.    Okay.  And is that in Georgia?

18        A.    Yes, ma'am.

19        Q.    All right.  And so you're at Fort Benning

20   doing the same job that you were doing at NSA, Panama

21   City?

22        A.    Yes, ma'am.

23        Q.    All right.  Are you still involved in the

24   union at all?

25        A.    Yes, ma'am.

1    Q.   Okay.  All right.

2    A.   I'm currently still at Fort Benning, and I

3  hold the position of union steward as well.

4    Q.   Okay.  Rennell, I cannot tell you how much I

5  appreciate this.  Okay.  This has been very helpful to

6  kind of put it in perspective for me.  Because the

7  Government has recently said to me that Emily Gray is

8  not comparable to Marshall because she sustained an

9  on-the-job injury, and therefore they were accommodating

10  her because of the on-the-job injury.

11          And I said, "No, no, no.  I think she had an

12  off-the-job injury."  So this helps me a lot in showing

13  that she was accommodated, but Marshall was not, and

14  either were two other guys, Derek and George.

15    A.   Yes, ma'am.

16    Q.   Unbelievable.  Okay, and you have personal

17  knowledge of what you've told me based upon either your

18  observations or what she told you, what Emily Gray told

19  you?

20    A.   Yes, ma'am.

21    Q.   Now, and you also confronted the

22  supervisors -- you confronted management about this?

23    A.   Yes.

24    Q.   So who did you talk to in management about the

25  failure to accommodate Mr. Marshall?

1      A.    To Derek Barber.

2      Q.    And he's the one who told you that

3  Mr. Marshall could not even do the light duty?

4      A.    Yes, ma'am.

5      Q.    Ray Shannahan, who is that?

6      A.    That is the occupational health nurse.

7      Q.    And is that somebody -- if somebody is

8  requesting to return light duty, is that somebody who

9  would do the evaluation of them?

10     A.    Yes, ma'am.

11     Q.    And do you know whether Ray Shannahan had ever

12  evaluated Emily Gray to determine whether she could come

13  back in a light-duty position after her off-the-job

14  injury?

15     A.    I'm not 100 percent sure, but I do know that

16  the Ray Shannahan proportion was something that

17  management -- our management, came up with because he

18  usually -- from prior instances, just go off what

19  somebody's doctor stated.  If their doctor cleared them,

20  he would say they're cleared as well without performing

21  another physical.

22     Q.    So normally, if somebody asked to come back to

23  work light duty, okay, then would they have to be

24  cleared by Shannahan first?

25     A.    They would have to turn in their paperwork to

1    Shannahan.

2          Q.    Okay.

3          A.    And once he looked at it, he would verbatim

4    say whatever their doctor stated.

5          Q.    Okay.  I've got here that they -- I've got

6    that NSA Panama City had displayed its unwillingness to

7    accommodate Mr. Marshall in a light-duty position, as he

8    was never directed to be evaluated by Ray Shannahan

9    prior to denial of his accommodation request.

10         So would it normally be, if somebody is asking

11   for an accommodation and you got a doctor's note, that

12   it would go then to Ray Shannahan?

13         A.    Yes ma'am.

14         Q.    Okay.  So here, the fact that it never went to

15   Ray Shannahan, what does that tell you?

16         A.    Well, that they were trying to replace the

17   bodies.  They were trying to shorten the process as much

18   as they could to eventually terminate and replace them.

19         Q.    To get Mr. Marshall out?

20         A.    Yes, ma'am.

21         Q.    Was it Barber's job to input Mr. Marshall's

22   time?

23         A.    Yes, ma'am.  He was a timekeeper.

24         Q.    Okay.  Is granting administrative leave

25   discretionary with Mapledoram?

1      A.    Yes, ma'am.

2      Q.    If you give somebody administrative leave, is

3 that discretionary with Mapledoram?

4      A.    No.  The administrative is hired at

5 Mapledoram.  It's at the CEO level.  He, Mapledoram,

6 gets to pick and choose like who he wants to bring it.

7 But the CO ultimately approves that administrative

8 leave.

9      Q.    Well, I've got that Marshall had been on

10 administrative leave, and then Mapledoram refused to

11 continue to authorize his administrative leave, and

12 Barber confirmed to Mr. Marshall that he could no longer

13 use that for the RA process.  Do you know anything about

14 that?

15     A.    No.

16     Q.    That he was there denying him administrative

17 leave?

18     A.    Yes ma'am.  He was on it for a second, but

19 like the paternity leave was involved in that as well.

20 So I wasn't personally sure what got him off, but I know

21 he had administrative leave and he had paternity leave.

22 So I think the paternity may have been before the

23 accident.  Well, kind of.  And then Mapledoram was

24 trying to help him out to come back to work.

25     Q.    That Mapledoram was?

1    A.    Yeah.  In the beginning of Cody's process, he

2    was.  And that's how he got the administrative leave.

3        Q.    And then it all of a sudden, it stopped once

4    he tried to come back to work on -- to do light duty?

5        A.    Yes ma'am.

6        Q.    So you saw -- it looks like there was a

7    pattern of denying these reasonable accommodations for

8    folks who needed them.  The three folks that we talked

9    about and then -- but giving it to a female?

10       A.    Yes, ma'am.

11       Q.    Okay.  Mr. Pitts, is there anything else that

12   you think would help the judge and me in terms of

13   evaluating Mr. Marshall's claim and in terms of how he

14   was treated in comparison to Emily Gray or denied the

15   reasonable accommodations?  Is there anything else that

16   you can add?

17       A.    I think he was treated unfairly.  I think once

18   the EEO complaint came through, that's when

19   Mapledoram -- management as a whole -- I won't pinpoint

20   just one of them -- they had a change of perspective on

21   Mr. Marshall.

22       Q.    Wow.  Okay.  Thank you so very much,

23   especially for doing this on Sunday before Memorial Day.

24       A.    Yes, ma'am.

25       Q.    Okay.  And, Rennell, do you want to read this

25

1   and make sure that our court reporter has taken down

2   accurately everything that you've said, or do you want

3   to waive that?  It's entirely up to you.

4         A.   I would like to read it.

5         Q.   Okay.  Very good.

6           (Statement concluded.)

26

```
1                    CERTIFICATE OF OATH

2

3   STATE OF FLORIDA    )

4   COUNTY OF LEON      )

5

6           I, the undersigned authority, certify that

7   RENNELL PITTS personally appeared before me via

8   videoconference, Zoom, and was duly sworn, and identity

9   was verified through government identification.

10

11          WITNESS my hand and official seal this 23RD

12  day of JUNE, 2024.

13

14

15

16          _____

17          ADIEREN M. NARRO, CER
            Notary Public - State of Florida
18          My Commission Expires 10/15/26
            Commission #HH277064
19

20

21

22

23

24

25
```

1                    REPORTER'S CERTIFICATE

2

3    STATE OF FLORIDA    )

4    COUNTY OF LEON      )

5

6           I, YVONNE LaFLAMME, RPR, CCR, FPR-C, Court

7    Reporter, certify that I was authorized to and did

8    transcribe the statement of RENNELL PITTS; that a review

9    of the transcript was requested; and that the transcript

10   is a true and complete record of my stenographic notes.

11

12          I FURTHER CERTIFY that I am not a relative,

13   employee, attorney or counsel of any of the parties, nor

14   am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am I

16   financially interested in the action.

17

18          DATED this 23RD Day of JUNE, 2024.

19

20                           _____

21                           YVONNE LaFLAMME, RPR, CCR, FPR-C

22

23

24

25

28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CASE NO. 5:23-CV-00155-MJF

JONATHAN MARSHALL,

     Plaintiff,

v.

CARLOS DEL TORO, in his
official capacity of
Secretary of the U.S.
Department of the Navy,

     Defendant.
_____/

IN RE:  STATEMENT OF RENNELL PITTS
TAKEN:  MAY 30 2024
TO: MR. PITTS
     The referenced transcript has been completed and is being e-mailed to you for reading and signing purposes.

     Upon receipt, please print the Errata Sheet and make any and all corrections on the Errata Sheet. Please return the Errata Sheet via mail or e-mail to **apexreportingservices@gmail.com** to our office within 30 days from receipt of this e-mail.

     The original of this deposition has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties listed below.

     Thank you.

_____
YVONNE LaFLAMME, RPR, FPR

29

```
1                          ERRATA SHEET
2        PAGE/LINE NO.          EXPLANATION FOR CORRECTION
3           -----         ------------------------------
4           -----         ------------------------------
5           -----         ------------------------------
6           -----         ------------------------------
7           -----         ------------------------------
8           -----         ------------------------------
9           -----         ------------------------------
10          -----         ------------------------------
11          -----         ------------------------------
12          -----         ------------------------------
13          -----         ------------------------------
14   STATE OF FLORIDA          )
15   COUNTY OF _____   )
16
17          I, the undersigned, declare under penalty of
18   perjury that I have read the foregoing transcript, and I
19   have made any corrections, additions or deletions that I
20   was desirous of making; that the foregoing is a true and
21   correct transcript of my testimony contained therein.
22          EXECUTED this _____ day of _____, 2024,
23   at _____, _____.
24                     _____
25                          RENNELL PITTS
```

## #

**#HH277064** [1] - 26:18

## '

**'22** [1] - 9:18
**'23** [3] - 9:19, 9:23, 9:25

## 1

**10/15/26** [1] - 26:18
**100** [1] - 21:15
**12:30** [1] - 1:16
**1991** [1] - 5:1
**1:22** [1] - 1:16

## 2

**2016** [1] - 5:12
**2017** [1] - 5:12
**2020** [1] - 6:4
**2021** [2] - 5:12, 6:4
**2022** [1] - 9:20
**2024** [5] - 1:15, 26:12, 27:18, 28:10, 29:22
**203** [1] - 2:4
**23RD** [2] - 26:11, 27:18
**26** [1] - 1:15

## 3

**30** [2] - 28:10, 28:16
**32301** [1] - 2:4
**32314** [1] - 1:23

## 4

**4** [1] - 3:5
**45** [1] - 18:24

## 5

**5785** [1] - 1:23
**597-5185** [1] - 1:24
**5:23-CV-00155-MJF** [2] - 1:3, 28:3

## 8

**850** [1] - 1:24

## A

**able** [3] - 7:14, 7:25, 8:24
**accident** [2] - 6:13, 23:23
**accommodate** [2] - 20:25, 22:7
**accommodated** [4] - 6:21, 7:19, 10:1, 20:13

**accommodating** [1] - 20:9
**accommodation** [12] - 5:16, 6:16, 9:15, 10:25, 12:14, 14:5, 14:7, 15:7, 15:19, 17:15, 22:9, 22:11
**accommodations** [7] - 12:8, 12:11, 13:1, 13:11, 15:2, 24:7, 24:15
**accurately** [1] - 25:2
**action** [2] - 27:15, 27:16
**ADA** [1] - 6:16
**add** [1] - 24:16
**additions** [1] - 29:19
**ADIEREN** [2] - 1:19, 26:17
**administrative** [14] - 6:17, 8:1, 10:20, 13:14, 15:2, 22:24, 23:2, 23:4, 23:7, 23:10, 23:11, 23:16, 23:21, 24:2
**advising** [1] - 18:20
**affirm** [1] - 4:10
**African** [1] - 19:10
**ago** [1] - 18:12
**allowed** [1] - 10:21
**allowing** [1] - 7:20
**altogether** [1] - 6:7
**American** [1] - 19:11
**announcements** [1] - 18:8
**answer** [3] - 13:6, 13:18, 18:13
**APEX** [1] - 1:22
**apexreportingservices@ gmail.com** [2] - 1:24, 28:16
**APPEARANCES** [1] - 2:1
**appeared** [1] - 26:7
**appreciate** [1] - 20:5
**approved** [4] - 8:3, 11:6, 11:14, 13:19
**approves** [1] - 23:7
**assignment** [1] - 10:11
**AT** [2] - 1:16, 1:16
**attorney** [2] - 27:13, 27:15
**authority** [1] - 26:6
**authorize** [1] - 23:11
**authorized** [1] - 27:7
**available** [2] - 13:8, 13:10

## B

**baby** [1] - 6:14
**Barber** [4] - 16:1, 16:15, 21:1, 23:12
**Barber's** [1] - 22:21
**based** [3] - 10:4, 10:6, 20:17
**beginning** [2] - 7:3, 24:1
**below** [1] - 28:21
**Benning** [3] - 19:15, 19:19, 20:2
**between** [2] - 10:15, 18:14

**birth** [3] - 4:24, 4:25
**bit** [1] - 8:4
**bodies** [2] - 17:7, 22:17
**book** [1] - 17:9
**books** [1] - 12:6
**BOX** [1] - 1:23
**brace** [1] - 7:12
**bring** [1] - 23:6
**BY** [3] - 1:19, 1:19, 4:18

## C

**cannot** [1] - 20:4
**capacity** [2] - 1:8, 28:7
**car** [1] - 6:13
**CARLOS** [2] - 1:8, 28:6
**case** [3] - 5:19, 6:12, 6:22
**CASE** [2] - 1:3, 28:3
**CCR** [2] - 27:6, 27:20
**CEO** [1] - 23:5
**CER** [2] - 1:19, 26:17
**CERTIFICATE** [2] - 26:1, 27:1
**CERTIFY** [1] - 27:12
**certify** [2] - 26:6, 27:7
**change** [1] - 24:20
**changes** [1] - 5:6
**chiefs** [4] - 15:21, 15:24, 15:25, 16:15
**choose** [1] - 23:6
**CITY** [2] - 1:2, 28:2
**City** [6] - 4:22, 5:9, 5:14, 12:4, 19:21, 22:6
**claim** [1] - 24:13
**cleared** [3] - 21:19, 21:20, 21:24
**clerical** [6] - 6:17, 7:21, 9:6, 10:2, 10:19, 13:14, 15:2, 15:13
**CO** [1] - 23:7
**Coast** [2] - 18:20, 18:22
**Cody** [3] - 14:3, 16:18, 17:3
**Cody's** [3] - 14:14, 16:19, 24:1
**coming** [1] - 14:7
**COMMENCING** [1] - 1:16
**Commission** [2] - 26:18, 26:18
**comp** [2] - 14:6, 18:22
**comparable** [1] - 20:8
**compare** [1] - 6:23
**comparison** [1] - 24:14
**complaint** [1] - 24:18
**complete** [1] - 27:10
**completed** [1] - 28:11
**completely** [1] - 8:15
**computer** [2] - 7:15, 8:2
**concluded** [1] - 25:6
**CONCLUDING** [1] - 1:16

**conclusion** [1] - 5:4
**CONFIDENTIAL** [1] - 1:13
**confirmed** [1] - 23:12
**confronted** [2] - 20:21, 20:22
**connected** [1] - 27:15
**contained** [1] - 29:21
**continue** [2] - 12:4, 23:11
**correct** [1] - 29:21
**CORRECTION** [1] - 29:2
**corrections** [3] - 5:5, 28:14, 29:19
**counsel** [2] - 27:13, 27:15
**COUNTY** [3] - 26:4, 27:4, 29:15
**COURT** [7] - 1:1, 1:20, 4:2, 4:6, 4:8, 4:13, 28:1
**Court** [1] - 27:6
**court** [1] - 25:1

## D

**date** [2] - 4:24, 10:15
**DATE** [1] - 1:15
**DATED** [1] - 27:18
**dates** [1] - 9:18
**days** [2] - 18:24, 28:17
**declare** [1] - 29:17
**Defendant** [2] - 1:10, 28:9
**DEL** [2] - 1:8, 28:6
**deletions** [1] - 29:19
**demand** [1] - 11:8
**denial** [1] - 22:9
**denied** [3] - 6:18, 24:14
**denying** [3] - 18:1, 23:16, 24:7
**Department** [2] - 1:9, 28:8
**deposition** [1] - 28:18
**Derek** [12] - 11:21, 12:1, 13:16, 14:1, 14:12, 14:14, 14:17, 14:18, 17:17, 20:14, 21:1
**DESCRIPTION** [1] - 3:3
**desirous** [1] - 29:20
**determine** [1] - 21:12
**different** [2] - 16:19, 19:13
**directed** [1] - 22:8
**discretionary** [2] - 22:25, 23:3
**displayed** [1] - 22:6
**DISTRICT** [4] - 1:1, 1:1, 28:1, 28:1
**DIVISION** [2] - 1:2, 28:2
**doctor** [11] - 8:3, 8:15, 8:19, 8:21, 8:23, 10:5, 16:21, 16:25, 21:19, 22:4
**doctor's** [2] - 16:22, 22:11
**down** [1] - 25:1
**DRAFT** [1] - 1:12
**due** [1] - 19:10

**duly** [2] - 4:16, 26:8
**during** [3] - 11:14, 11:16, 15:11
**duties** [1] - 10:2
**duty** [50] - 7:14, 8:5, 8:17, 8:21, 8:25, 9:5, 10:5, 10:6, 10:11, 10:13, 10:16, 10:25, 11:1, 11:11, 11:14, 11:16, 11:18, 12:23, 13:8, 15:9, 15:12, 15:22, 15:23, 15:24, 16:6, 16:17, 16:20, 16:22, 16:23, 16:25, 17:2, 17:4, 17:13, 17:18, 17:21, 17:22, 18:1, 18:3, 18:10, 18:11, 18:24, 18:25, 19:5, 19:7, 21:3, 21:8, 21:13, 21:23, 22:7, 24:4

**E**

**e-mail** [2] - 28:15, 28:17
**e-mailed** [1] - 28:12
**EEO** [2] - 16:12, 24:18
**either** [3] - 16:15, 20:14, 20:17
**email** [2] - 15:20, 16:3
**Emily** [24] - 6:23, 7:3, 9:1, 9:15, 10:22, 11:12, 11:16, 11:23, 12:11, 12:14, 12:20, 12:22, 13:10, 14:22, 15:7, 15:12, 17:8, 18:9, 19:4, 20:7, 20:18, 21:12, 24:14
**employed** [2] - 5:25, 12:4
**employee** [2] - 27:13, 27:14
**end** [2] - 6:15, 10:20
**ended** [2] - 7:5, 17:11
**entirely** [1] - 25:3
**environment** [1] - 19:12
**Errata** [3] - 28:13, 28:14, 28:15
**errata** [1] - 28:19
**ERRATA** [1] - 29:1
**especially** [1] - 24:23
**ESQ** [1] - 2:3
**evaluated** [2] - 21:12, 22:8
**evaluating** [1] - 24:13
**evaluation** [1] - 21:9
**eventually** [1] - 22:18
**exact** [1] - 11:17
**exactly** [5] - 8:13, 9:12, 11:2, 11:24, 18:16
**Examination** [1] - 3:5
**EXAMINATION** [1] - 4:17
**excuse** [1] - 17:3
**EXECUTED** [1] - 29:22
**expired** [1] - 10:15
**Expires** [1] - 26:18
**explain** [1] - 13:13
**EXPLANATION** [1] - 29:2

**F**

**fact** [1] - 22:14
**failure** [1] - 20:25
**far** [2] - 7:25, 14:7
**favorably** [2] - 12:18, 12:21
**felt** [1] - 19:11
**female** [1] - 24:9
**field** [2] - 15:9, 18:11
**figure** [1] - 12:23
**filed** [1] - 12:10
**FINAL** [1] - 1:12
**financially** [1] - 27:16
**finished** [4] - 11:17, 11:19, 13:24, 15:8
**fire** [2] - 6:17, 9:10
**fired** [2] - 17:18, 18:7
**firefighter** [1] - 4:21
**firing** [1] - 18:3
**first** [6] - 4:16, 7:7, 7:14, 9:15, 14:2, 21:24
**FL** [1] - 2:4
**FLORIDA** [6] - 1:1, 1:23, 26:3, 27:3, 28:1, 29:14
**Florida** [1] - 26:17
**FMLA** [2] - 6:13, 6:15
**folks** [2] - 24:8
**follows** [1] - 4:16
**FOR** [1] - 29:2
**forced** [2] - 12:5, 12:7
**foregoing** [2] - 29:18, 29:20
**Foreman** [2] - 12:2, 14:2
**forgot** [1] - 9:12
**former** [1] - 4:21
**forms** [1] - 12:11
**Fort** [4] - 19:15, 19:19, 20:2
**forwarded** [2] - 28:18, 28:20
**Four** [1] - 5:10
**four** [1] - 14:1
**FPR** [4] - 1:19, 27:6, 27:20, 28:24
**FPR-C** [2] - 27:6, 27:20
**frame** [2] - 7:24, 11:15
**fulfill** [2] - 19:5, 19:7
**full** [6] - 4:3, 10:13, 10:15, 15:9, 18:11, 18:24
**FURTHER** [1] - 27:12

**G**

**Gadsden** [1] - 2:4
**George** [8] - 12:2, 13:16, 14:2, 14:14, 14:15, 14:19, 17:17, 20:14
**George's** [1] - 14:12
**Georgia** [1] - 19:17
**given** [8] - 8:16, 8:17, 8:20, 10:6, 12:8, 12:14, 15:1, 17:21

**Gold** [1] - 18:22
**government** [1] - 26:9
**Government** [1] - 20:7
**granted** [1] - 12:23
**granting** [1] - 22:24
**Gray** [18] - 6:23, 6:24, 7:3, 9:1, 10:22, 11:1, 11:12, 11:16, 11:21, 11:23, 14:21, 14:22, 18:9, 19:4, 20:7, 20:18, 21:12, 24:14
**guess** [1] - 8:3
**Gulf** [1] - 18:20
**guys** [1] - 20:14

**H**

**hand** [2] - 4:9, 26:11
**Harmon** [2] - 11:22, 14:15
**health** [1] - 21:6
**help** [5] - 11:7, 13:17, 13:19, 23:24, 24:12
**helpful** [1] - 20:5
**helps** [1] - 20:12
**herself** [1] - 8:9
**himself** [1] - 6:23
**hired** [1] - 23:4
**hold** [2] - 5:24, 20:3
**Hospital** [2] - 18:21, 18:22
**hospital** [1] - 18:21
**hostile** [1] - 19:12
**house** [1] - 9:10
**hurt** [1] - 18:20

**I**

**identification** [1] - 26:9
**identify** [1] - 4:19
**identity** [1] - 26:8
**IN** [1] - 28:10
**INC** [1] - 1:22
**incapable** [1] - 16:19
**individuals** [1] - 19:11
**information** [1] - 10:4
**initial** [1] - 18:24
**injured** [7] - 5:15, 6:13, 7:3, 8:10, 9:11, 10:16, 18:15
**injuries** [2] - 7:5, 14:12
**injury** [22] - 6:24, 6:25, 7:7, 7:16, 7:20, 8:7, 9:9, 9:13, 9:16, 10:2, 10:11, 11:3, 12:15, 14:9, 15:7, 18:15, 18:18, 19:6, 20:9, 20:10, 20:12, 21:14
**input** [1] - 22:21
**inspections** [1] - 6:18
**instable** [1] - 15:14
**instances** [1] - 21:18
**instead** [1] - 8:1
**interested** [1] - 27:16
**Internet** [1] - 15:14

**involved** [2] - 19:23, 23:19
**involvement** [1] - 16:5
**issue** [1] - 6:11
**issues** [1] - 6:22

**J**

**January** [2] - 9:23, 9:25
**job** [39] - 6:24, 6:25, 7:16, 7:19, 8:7, 8:9, 8:11, 9:8, 9:12, 9:15, 10:2, 11:3, 12:15, 13:9, 14:9, 14:11, 14:13, 14:14, 14:15, 14:18, 14:19, 14:21, 14:22, 14:23, 15:5, 15:7, 15:13, 18:7, 18:15, 18:18, 19:6, 19:7, 19:20, 20:9, 20:10, 20:12, 21:13, 22:21
**jobs** [3] - 11:25, 17:8, 18:2
**Jonathan** [2] - 5:15, 6:12, 10:19, 11:10, 13:24
**JONATHAN** [2] - 1:5, 28:3
**judge** [1] - 24:12
**JUNE** [2] - 26:12, 27:18
**justified** [1] - 18:3

**K**

**kind** [3] - 17:8, 20:6, 23:23
**knowledge** [2] - 14:6, 20:17

**L**

**LaFLAMME** [4] - 1:19, 27:6, 27:20, 28:24
**last** [1] - 9:24
**least** [1] - 5:25
**leave** [14] - 5:3, 12:5, 12:7, 19:9, 22:24, 23:2, 23:8, 23:10, 23:11, 23:17, 23:19, 23:21, 24:2
**left** [5] - 6:7, 6:8, 15:12, 17:21
**LEON** [2] - 26:4, 27:4
**level** [1] - 23:5
**light** [46] - 7:14, 8:5, 8:17, 8:21, 8:25, 9:5, 10:5, 10:6, 10:11, 10:25, 11:1, 11:11, 11:14, 11:16, 11:18, 12:23, 13:8, 15:12, 15:21, 15:23, 15:24, 16:6, 16:17, 16:20, 16:21, 16:23, 16:25, 17:2, 17:3, 17:13, 17:16, 17:17, 17:21, 17:22, 18:1, 18:2, 18:10, 18:25, 19:5, 19:7, 21:3, 21:8, 21:13, 21:23, 22:7, 24:4
**light-duty** [5] - 18:10, 19:5, 19:7, 21:13, 22:7
**listed** [1] - 28:20

**LOCATION** [1] - 1:17
**looked** [1] - 22:3
**looks** [1] - 24:6

# M

**ma'am** [52] - 5:7, 5:17, 5:23, 6:10, 7:18, 7:22, 8:18, 9:7, 10:7, 11:4, 11:13, 12:9, 12:12, 12:16, 13:3, 13:5, 13:12, 13:22, 14:1, 14:10, 14:20, 14:23, 14:25, 15:3, 15:17, 15:20, 16:8, 16:18, 17:5, 17:11, 17:14, 17:20, 17:25, 18:4, 18:6, 19:2, 19:8, 19:18, 19:22, 19:25, 20:15, 20:20, 21:4, 21:10, 22:13, 22:20, 22:23, 23:1, 23:18, 24:5, 24:10, 24:24
**mail** [3] - 28:15, 28:17
**mailed** [1] - 28:12
**management** [8] - 10:23, 11:5, 19:10, 20:22, 20:24, 21:17, 24:19
**manning** [2] - 13:18, 13:19
**Mapledoram** [11] - 6:18, 16:1, 16:15, 22:25, 23:3, 23:5, 23:10, 23:23, 23:25, 24:19
**MARIE** [1] - 2:3
**Marie** [1] - 2:3
**marie@mattoxlaw.com** [1] - 2:5
**MARSHALL** [2] - 1:5, 28:3
**Marshall** [18] - 5:15, 5:20, 6:12, 11:10, 13:24, 14:3, 15:4, 15:6, 17:17, 20:8, 20:13, 20:25, 21:3, 22:7, 22:19, 23:9, 23:12, 24:21
**Marshall's** [2] - 22:21, 24:13
**MATTOX** [2] - 2:3, 4:18
**Mattox** [2] - 2:3, 3:5
**MAY** [2] - 1:15, 28:10
**medical** [1] - 7:11
**medication** [1] - 14:16
**Memorial** [1] - 24:23
**Meyer** [5] - 11:21, 12:1, 12:2, 14:2, 17:17
**Michael** [2] - 14:2, 14:5
**minute** [1] - 18:12
**months** [4] - 8:5, 9:5, 10:9
**Moore** [1] - 19:16
**MR** [3] - 4:7, 4:12, 28:11
**MS** [1] - 4:18

# N

**name** [2] - 4:3, 4:5
**NARRO** [2] - 1:19, 26:17
**Navy** [2] - 1:9, 28:8

**necessarily** [1] - 12:22
**needed** [7] - 5:15, 5:20, 11:11, 13:25, 15:6, 19:13, 24:8
**never** [2] - 22:8, 22:14
**new** [1] - 13:14
**newer** [1] - 13:4
**next** [2] - 16:9, 19:11
**NO** [4] - 1:3, 3:3, 28:3, 29:2
**nobody** [1] - 12:23
**normal** [1] - 17:24
**normally** [2] - 21:22, 22:10
**NORTHERN** [2] - 1:1, 28:1
**Notary** [1] - 26:17
**note** [2] - 16:22, 22:11
**notes** [1] - 27:10
**nothing** [1] - 4:11
**Nothing** [1] - 14:7
**NSA** [6] - 4:22, 5:9, 5:14, 12:4, 19:20, 22:6
**nurse** [1] - 21:6

# O

**OATH** [1] - 26:1
**observations** [2] - 10:6, 20:18
**obviously** [1] - 15:22
**occupational** [1] - 21:6
**OF** [11] - 1:1, 1:14, 26:1, 26:3, 26:4, 27:3, 27:4, 28:1, 28:10, 29:14, 29:15
**off-the-job** [12] - 6:25, 7:16, 7:19, 8:7, 9:15, 10:2, 11:3, 12:15, 15:7, 19:6, 20:12, 21:13
**offer** [1] - 16:12
**offered** [3] - 10:25, 16:10, 17:3
**office** [1] - 28:16
**official** [3] - 1:18, 26:11, 28:7
**on-the-job** [8] - 6:24, 9:8, 9:12, 14:9, 18:15, 18:18, 20:9, 20:10
**once** [4] - 22:3, 24:3, 24:17, 28:19
**one** [10] - 6:21, 7:5, 7:6, 7:14, 10:25, 14:23, 18:23, 19:8, 21:2, 24:20
**open** [2] - 13:15
**opinion** [2] - 17:6, 18:6
**opportunity** [1] - 5:4
**ordering** [2] - 28:19, 28:20
**original** [1] - 28:18
**outside** [1] - 13:17

# P

**P.A** [2] - 2:3
**p.m** [2] - 1:16, 1:16

**P.O** [1] - 1:23
**packed** [1] - 7:1
**PAGE** [1] - 3:3
**PAGE/LINE** [1] - 29:2
**PANAMA** [2] - 1:2, 28:2
**Panama** [6] - 4:22, 5:9, 5:14, 12:4, 19:20, 22:6
**paperwork** [2] - 8:1, 21:25
**Parkins** [3] - 14:2, 14:21, 18:19
**part** [2] - 5:21, 5:25
**parties** [2] - 27:13, 28:20
**parties'** [1] - 27:14
**party** [1] - 28:19
**paternity** [3] - 23:19, 23:21, 23:22
**pattern** [1] - 24:7
**penalty** [1] - 29:17
**pending** [4] - 12:13, 13:1, 13:21, 14:3
**people** [8] - 6:21, 11:7, 11:11, 11:20, 13:7, 14:1, 17:7, 17:12
**percent** [1] - 21:15
**performing** [2] - 18:10, 21:20
**period** [5] - 6:16, 10:1, 10:14, 11:17, 15:11
**perjury** [1] - 29:18
**personal** [1] - 20:16
**personally** [2] - 23:20, 26:7
**personnel** [3] - 10:24, 17:9, 18:8
**perspective** [2] - 20:6, 24:20
**physical** [1] - 21:21
**pick** [1] - 23:6
**picking** [1] - 19:10
**pinpoint** [1] - 24:19
**Pitts** [7] - 4:2, 4:5, 4:19, 4:21, 5:8, 7:23, 24:11
**PITTS** [11] - 1:14, 3:4, 4:5, 4:7, 4:12, 4:15, 26:7, 27:8, 28:10, 28:11, 29:25
**Plaintiff** [3] - 1:6, 2:2, 28:4
**point** [4] - 15:15, 16:14, 16:16, 18:19
**position** [7] - 5:24, 9:6, 18:10, 19:5, 20:3, 21:13, 22:7
**positions** [2] - 17:22, 17:24
**posted** [1] - 18:8
**PPL** [1] - 10:20
**presuming** [1] - 10:10
**prevention** [1] - 6:17
**print** [1] - 28:13
**process** [6] - 11:21, 11:24, 17:15, 22:17, 23:13, 24:1
**proportion** [1] - 21:16
**provided** [1] - 10:4
**Public** [1] - 26:17

**purposes** [1] - 28:12
**put** [4] - 10:24, 11:22, 17:23, 20:6
**putting** [1] - 8:2

# R

**r-e-n-n-e-l-l** [1] - 4:7
**RA** [4] - 11:21, 11:22, 12:11, 23:13
**raise** [1] - 4:9
**RANELL** [1] - 4:6
**Ray** [6] - 21:5, 21:11, 21:16, 22:8, 22:12, 22:15
**RE** [1] - 28:10
**re** [1] - 9:11
**re-injured** [1] - 9:11
**reach** [1] - 15:23
**read** [4] - 5:5, 24:25, 25:4, 29:18
**reading** [1] - 28:12
**reasonable** [5] - 10:24, 12:25, 17:15, 24:7, 24:15
**receipt** [2] - 28:13, 28:17
**received** [1] - 28:19
**recently** [1] - 20:7
**record** [3] - 4:3, 4:20, 27:10
**referenced** [1] - 28:11
**refused** [2] - 17:19, 23:10
**relative** [2] - 27:12, 27:14
**release** [1] - 8:23
**released** [6] - 8:20, 8:22, 10:5, 15:8, 17:23, 18:14
**remember** [3] - 8:12, 9:14, 18:13
**RENNELL** [7] - 1:14, 3:4, 4:15, 26:7, 27:8, 28:10, 29:25
**Rennell** [6] - 4:5, 4:21, 10:18, 19:9, 20:4, 24:25
**replace** [2] - 17:10, 22:16, 22:18
**replaced** [1] - 17:12
**REPORTED** [1] - 1:19
**Reporter** [1] - 27:7
**REPORTER** [5] - 1:20, 4:2, 4:6, 4:8, 4:13
**reporter** [1] - 25:1
**REPORTER'S** [1] - 27:1
**REPORTING** [1] - 1:22
**request** [7] - 11:22, 12:10, 12:25, 13:4, 13:20, 15:12, 22:9
**requested** [5] - 6:16, 13:2, 13:11, 13:16, 27:9
**requesting** [1] - 21:8
**response** [1] - 11:13
**restrictions** [2] - 7:11
**return** [4] - 8:20, 17:19, 21:8, 28:15

**returned** [1] - 10:9
**returns** [1] - 18:11
**review** [1] - 27:8
**route** [2] - 16:11, 16:12
**routes** [1] - 16:11
**RPR** [4] - 1:19, 27:6, 27:20, 28:24

## S

**saw** [1] - 24:6
**seal** [1] - 26:11
**second** [4] - 5:19, 10:10, 19:1, 23:18
**Secretary** [2] - 1:9, 28:7
**see** [5] - 15:21, 15:24, 16:22, 16:24, 17:6
**seeing** [1] - 7:25
**Shannahan** [8] - 21:5, 21:11, 21:16, 21:24, 22:1, 22:8, 22:12, 22:15
**Sheet** [3] - 28:13, 28:14, 28:15
**SHEET** [1] - 29:1
**shorten** [1] - 22:17
**showing** [1] - 20:12
**signing** [1] - 28:12
**situation** [1] - 16:19
**situations** [1] - 11:2
**Skaggs** [1] - 16:2
**solemnly** [1] - 4:9
**solutions** [1] - 16:10
**sorry** [1] - 12:20
**specifically** [1] - 10:17
**started** [2] - 7:13, 9:19
**STATE** [3] - 26:3, 27:3, 29:14
**state** [1] - 4:3
**State** [1] - 26:17
**statement** [3] - 5:2, 5:5, 27:8
**STATEMENT** [3] - 1:13, 1:14, 28:10
**Statement** [1] - 25:6
**STATES** [2] - 1:1, 28:1
**stating** [1] - 13:17
**stenographic** [1] - 27:10
**steward** [5] - 6:1, 6:6, 6:9, 15:15, 20:3
**still** [6] - 5:14, 9:21, 12:3, 13:21, 19:23, 20:2
**stop** [1] - 6:5
**stopped** [2] - 6:8, 24:3
**stops** [1] - 18:10
**Street** [1] - 2:4
**sudden** [2] - 13:14, 24:3
**Sunday** [1] - 24:23
**SUNDAY** [1] - 1:15
**supervisor** [1] - 16:3
**supervisors** [1] - 20:22
**supposedly** [1] - 11:25

**sustain** [1] - 9:8
**sustained** [2] - 8:7, 20:8
**sustains** [1] - 18:17
**swear** [1] - 4:10
**SWORN** [2] - 1:13, 1:14
**sworn** [4] - 4:16, 5:2, 5:5, 26:8

## T

**TAKEN** [1] - 28:10
**TALLAHASSEE** [1] - 1:23
**Tallahassee** [1] - 2:4
**tallycourtreporting.com** [1] - 1:25
**terminate** [1] - 22:18
**terms** [2] - 24:12, 24:13
**testified** [1] - 4:16
**testimony** [2] - 4:10, 29:21
**THE** [4] - 4:2, 4:6, 4:8, 4:13
**theirs** [1] - 12:13
**therefore** [1] - 20:9
**therein** [1] - 29:21
**three** [2] - 16:3, 24:8
**TIME** [1] - 1:16
**timekeeper** [1] - 22:23
**Timothy** [1] - 4:5
**TO** [1] - 28:11
**today** [1] - 4:11
**TORO** [2] - 1:8, 28:6
**total** [1] - 5:10
**transcribe** [1] - 27:8
**TRANSCRIBED** [1] - 1:19
**transcript** [5] - 27:9, 28:11, 29:18, 29:21
**treated** [4] - 12:18, 12:20, 24:14, 24:17
**tried** [1] - 24:4
**true** [2] - 27:10, 29:20
**truth** [2] - 4:11
**try** [1] - 15:18
**trying** [6] - 12:22, 17:7, 17:8, 22:16, 22:17, 23:24
**turn** [1] - 21:25
**two** [5] - 7:5, 8:5, 9:4, 9:5, 20:14

## U

**U.S** [2] - 1:9, 28:7
**ultimately** [2] - 12:6, 23:7
**Unbelievable** [2] - 18:9, 20:16
**Under** [1] - 11:2
**under** [1] - 29:17
**undersigned** [2] - 26:6, 29:17
**unfairly** [1] - 24:17
**union** [9] - 5:21, 5:25, 6:1, 6:6, 6:9, 15:15, 16:11,

19:24, 20:3
**UNITED** [2] - 1:1, 28:1
**unwillingness** [1] - 22:6
**up** [5] - 7:5, 9:23, 17:11, 21:17, 25:3

## V

**VA** [1] - 14:15
**vending** [1] - 9:19
**verbatim** [1] - 22:3
**verified** [1] - 26:9
**versus** [1] - 6:24
**via** [2] - 26:7, 28:15
**VIA** [1] - 1:17
**videoconference** [1] - 26:8
**VIDEOCONFERENCE** [1] - 1:17
**voluntary** [1] - 5:3

## W

**waive** [1] - 25:3
**wants** [1] - 23:6
**ways** [1] - 16:13
**whole** [2] - 4:11, 24:19
**wife** [1] - 6:14
**WITNESS** [1] - 26:11
**worker's** [1] - 18:22
**workers** [1] - 14:6
**world** [2] - 10:19, 12:17
**Wow** [2] - 18:5, 24:22

## Y

**year** [6] - 4:24, 4:25, 9:14, 9:20, 9:24, 11:23
**years** [2] - 5:10, 5:11
**yourself** [1] - 4:20
**YVONNE** [4] - 1:19, 27:6, 27:20, 28:24

## Z

**Zoom** [1] - 26:8
**ZOOM** [1] - 1:18